UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

NELSON WYLLIE,

         Plaintiff,

No. _____

vs

TRALONGO, LLC,
a Florida limited liability company,
TRISH GEORGE individually, MARY HUGHES,
individually, and, BETHANY ROSE individually.
.

         Jointly and Severally,

         Defendants.
_____/

## COMPLAINT AND JURY DEMAND

The Plaintiff sues the defendants for retaliation under the Federal False Claims Act, and, for discharge in violation of public policy under Michigan law.

## PARTIES

1.    The Plaintiff Nelson Wyllie ("Wyllie") is an individual who resides in Clinton County, Michigan.

2. The Defendant Tralongo, LLC ("Tralongo") is a Florida limited liability company with its principal office at 13621 NW 12th Street, Suite 120, Sunrise, Florida 33323. Tralongo also has an office in Atlanta, Georgia.

3. The Defendant Trish George is Tralongo's Vice President of Operations. She resides in the State of Georgia. She is sued personally, because she personally participated or cooperated in the discharge of Wyllie from employment.

4. The Defendant Mary Hughes is Tralongo's Vice President for Clinical Growth. She resides in the State of Georgia. She is sued personally, because she personally participated or cooperated in the discharge of Wyllie from employment.

5. The Defendant Bethany Rose is Tralongo's People Strategy Officer (human resources director) and resides in the State of Florida. She is sued personally, because she personally participated or cooperated in the discharge of Wyllie from employment.

## JURISDICTION AND VENUE

6. Wyllie makes claims under the Constitution, laws, or treaties of the United States for retaliation under the Federal False Claims Act [31 USC 3730(h)]. Therefore, this Court has original subject matter jurisdiction under 28 USC 1331.

7. Venue is proper in the United States District Court for the Eastern District of Michigan, under 28 USC 1391, because the Defendants are subject to

this Court's personal jurisdiction and a substantial part of the events or omissions giving rise to the claim occurred in this District.

8. Venue is proper in the United States District Court for the Eastern District of Michigan, under federal diversity jurisdiction, 28 U.S.C. 1332(a)(2), because the citizenship of the Plaintiff is completely diverse from the citizenship of the Defendants and the amount in controversy exceeds $75,000.

9. Wyllie's claims under state law are so related to his claim within original jurisdiction of this Court that his state law claims form part of the same case or controversy under Article III of the United States Constitution. Therefore, under 28 USCS 1367, this Court has supplemental jurisdiction over Wyllie's state law claims.

## **COMMON ALLEGATIONS**

10. Tralongo owns and administers dental offices in several states, including Michigan. In 2017, Tralongo bought five pre-existing dental offices in Michigan. The offices are in Dearborn, Adrian, Highland, Lansing, and Charlotte, Michigan. On May 15, 2017, Tralongo created its subsidiary Tralongo-Cambridge, LLC to operate the Dearborn office.

11. In 2017, Wyllie interviewed in Tralongo's Atlanta office for the job of Regional Manager II.

12. On June 29, 2017, Trish George, for Tralongo, signed an employment contract with Wyllie. She hired him as Regional Manager II for the five offices in Michigan. The contract states he is an "at-will" employee of Tralongo. Employment contract, Ex. 1.

13. Beginning July 17, 2017, Wyllie ran the non-clinical aspects of the dental practices. All office managers of the five dental offices reported to Wyllie. The five offices were staffed by about 100 employees.

14. Wyllie moved himself and his family from Sacramento, California to accept the employment offered by Tralongo. Tralongo paid for part of the moving expenses, but Wyllie had to pay the rest.

15. Dentist Keith West formerly owned and operated four of the offices that Wyllie managed: the offices in Adrian, Highland, Lansing, and Charlotte, Michigan. On July 17, 2017, Tralongo purchased a 70% interest in West's offices. West retained a 30% interest for some period of time. But Tralongo had total control of the management of West's offices. After Tralongo purchased that portion of West's offices, West still treated patients at three of the four offices (in Highland, Lansing, and Charlotte) and, for a time, his staff remained in place at those offices.

16. Wyllie's first day on the job was July 17, 2017. He worked and lived in Michigan. His supervisor was Trish George who worked out of Tralongo's

4

office in Atlanta, Georgia. But from August 2017 through Wyllie's discharge on October 31, 2017, Trish George worked four days per week in Michigan to supervise Wyllie.

17. On about July 21, 2017, the entire staff at the Adrian office (except one dental assistant) resigned. The resigning employees included one dentist and the office manager. A second doctor resigned in early September 2017. Trish George, Tralongo's VP of Operations, told Wyllie just to let the staff go without conducting any exit interviews, even though Tralongo's company policy required exit interviews.

18. Within a short time after Wyllie was on the job, Dr. West told him that, in 2003, West was convicted of a felony for fraudulently billing insurance companies.[1] West had lost his dental license but then got it reinstated.

19. On September 22, 2017, Eric Masson, Tralongo's Chief Legal Officer, emailed Wyllie and stated that West was prohibited from treating any Medicaid patient even just for treatment planning or consulting. West could not do treatment planning or consulting for any Medicaid patient, even if there was no charge for those services, and even if another doctor performed the work identified in the treatment plan.

---

[1] The conviction for mail fraud occurred in the United States District Court, Eastern District of Michigan, in case No. CR03-80567-DT. The conviction arose from West submitting various bills for dental services to Blue Cross Blue Shield when the services were never rendered.

5

20. Masson also told Wyllie that dentists could not use the D9999 billing entry code for insurance claims (a miscellaneous code that does not reveal the actual service rendered), that patient charts must match procedure-by-procedure to the services that are billed to insurance, and that patient co-pays cannot be forgiven.

21. Eric Masson and Trish George told Wyllie that West could not treat patients whose insurance was Medicare or patients who were municipal or state employees self-insured by the government (plans administered by Delta Dental.) Katie Kirkadahl, an employee of the Charlotte office told Wyllie that restriction was part of West's punishment for the felony conviction.

22. After the resignation of the Adrian employees, Trish George instructed Wyllie to personally run the Adrian office until he could hire new staff. It took about 60 days for Wyllie to hire the new staff for Adrian. He also hired managers for the Lansing and Highland offices. This significantly impacted his ability to review and improve the administrative processes of the other offices.

23. While Wyllie was managing the Adrian office, he found out the reason that the Adrian staff had resigned. A patient from that office received an explanation of benefits from his insurance company showing that Dr. Katba provided certain services for which the insurance paid. The patient confronted Dr. Katba, "Why are you getting paid, when I saw Dr. West?" Thus, Katba discovered

that West had been submitting West's claims under Katba's Social Security number. Katba and the staff then resigned.

24. Then, Wyllie reviewed the records of West's insurance claims and financial records back to January 1, 2017. Wyllie discovered:

   a. West had billed Dentquest (a federally subsidized program through Medicare/Medicaid) for West's own patients but listed Dr. Katba as the treating dentist.

   b. West had been fraudulently splitting patients' charges between calendar years to avoid insurance maximums.

   c. West had been treating patients covered by Medicaid and Medicare even though he was prohibited him from doing so.

   d. West had been using the D9999 billing code to bill insurance companies in order to mask that he was billing for an entire procedure (such as preparing a crown and installing a crown) when he had only completed part of the procedure. (Insurance companies do not pay for the entire procedure up front. The provider must bill each segment of the procedure separately.)

   e. West had no license from the federal Drug Enforcement Agency to order prescription medicine. Other dentists had been prescribing medicine for West's patients whom they had not diagnosed or treated.

7

    f. West had taken large pre-payments from patients for services which were never rendered.

After July 17, 2017, when Tralongo purchased West's dental offices and when West was an employee of Tralongo, Tralongo transmitted some of the fraudulent billings described above to Medicaid, Medicare, Dentquest, and to private insurance companies

    25. Since West's past revenue was based upon fraudulent billings, the actual profitability of his offices was overstated when Tralongo purchased his offices. When Wyllie took over the management of those offices, he stopped the fraudulent billing practices and profits decreased according.

    26. Wyllie and his operations manager tried to make changes in the business staff for West's offices in order to avoid West's fraudulent billing practices. But West would countermand those decisions. Wyllie complained to his supervisors, Trish George and Mary Hughes. But they told him that West had the final say. This was contrary to what Tralongo told Wyllie about his authority, when he was hired.

    27. West engaged in racist hiring practices that violated state and federal laws prohibiting discrimination in employment. Wyllie discussed with West an employment applicant named "Sonique." West said, "With a name Sonique, I hope she isn't black. They are all lazy; you know those black people, and black

8

women are even lazier. I never met one that wasn't." Wyllie addressed this discrimination with Trish George, but she was dismissive.

28. West also used racist language to refer to a new dentist of Asian ancestry. West called her "Dr. Asian." He also said, "Those Koreans or any Asians for that matter are slow and don't do good work. Can you even understand her when she talks?" West said this in front of Jeanine Wood (corporate trainer) who did not address West's comments. Wyllie reported West's comments to Trish George. Jeanine Wood confirmed to Trish George that West had spoken those words. But Trish George did not address West about his racist comments.

29. Tralongo's upper management assigned an employee to work with West and monitor him in an effort to curb his fraudulent billing practices. During the week of October 16, 2017, that monitor told Wyllie that a she saw West seeing a state employee that West is not allowed to see. West got mad at the monitor and told Trish George to remove her. Wyllie advised Tralongo's compliance and billing department of this incident. But instead of addressing the matter with West, Trish George removed that employee from monitoring West. George never consulted Wyllie about removing the monitor. The dismissal of the monitor impaired Wyllie's ability to identify West's fraudulent billing practices in the future.

9

30.     On October 18, 2017, Mary Hughes, Tralongo's Vice President for Clinical Growth, told Wyllie that the Michigan offices had to produce more profits ("meet their numbers") or Tralongo would discharge him.  Wyllie then told Hughes about West's fraudulent billing practices detailed above.  He told her that some of those practices had occurred after Tralongo purchased West's offices.  He told her that, since West's past revenue was based upon fraudulent billings, the actual profitability of his offices was overstated when Tralongo purchased his offices.  Wyllie told Hughes that West was engaging in racist hiring practices that violated state and federal laws prohibiting discrimination in employment.  But Hughes did not relent on her ultimatum to Wyllie.   Hughes just stated, "All doctors are assholes.  You just have to take it."

31.     Trish George pressured Wyllie to generate more revenue from West's offices.  Wyllie told Trish George that West had engaged in the fraudulent billing practices detailed above.  He told her that some of those practices had occurred after Tralongo purchased West's offices.  He told them West had produced more profit only because of those fraudulent practices.  But Trish George did not stop insisting that Wyllie produce more profits from those offices.

32.     After Hughes' ultimatum on October 18, 2017, Wyllie became severely depressed because his supervisors refused to recognize and address

West's illegal practices.  Wyllie had moved his family across the country and now was in an untenable position.  He was so depressed he stopped eating.

33. On October 23, 2017, Wyllie sent a letter to Bethany Rose, Tralongo's human resources director.  Since Wyllie's supervisors would not listen to him, he thought Rose might.  He told Rose he was working in a hostile work environment which was taking a physical and emotional toll on him.

34. In his letter to Rose, he explained that, when he was hired, Tralongo had not apprised him of West's nefarious past.  He explained how West's fraudulent billing practices had inflated the profitability of his offices, and, now that Wyllie was correcting those practices, Tralongo was nevertheless holding him to unrealistic profits margins.  He told Rose of West's racist hiring attitudes, of the removal of the employee monitoring West, HIPAA and OSHA violations, and other matters of concern to Wyllie.  Letter to Rose, Ex. 2.

35. In his letter to Rose, Wyllie refused to continue the illegal billing practices in West's offices:

> I am not sure what sort of repercussions may come of bringing my experiences and concerns to your attention, but at the end of the day it is my personal reputation that is at stake and I will not be personally liable for HIPPA & OSHA violations and most of all I will not be a part of potential Fraud. Because of my experience thus far I do fear retribution from those above me for speaking out about what I have witnessed these past four months.

Ex. 2, p, 4.

36. After writing the letter to Bethany Rose, on October 24, 2017, Wyllie became suicidal because he felt he had moved his family across the country and now was in a position where his truthful reporting to his employer would result in his discharge. He went to the hospital emergency room. He was diagnosed with a major depressive disorder. He began outpatient treatment from a psychologist and psychiatrist at the Lansing Institute of Behavioral Medicine (treatment he has continued to the present.) He presented to Bethany Rose a doctor's note excusing him from work through November 3, 2017.

37. On October 31, 2017, Bethany Rose sent a letter to Wyllie discharging him from his employment for "poor performance." Letter, 10/31/17, Ex. 3.

## COUNT I – VIOLATION OF THE RETALIATION PROVISION OF THE FEDERAL FALSE CLAIMS ACT, 31 USC 3730(h)

38. Wyllie incorporates paragraphs 1 through 37 above.

39. The Defendants have knowingly presented, or caused to be presented, a false or fraudulent claim[2] for payment or approval to the United States government, under the Federal False Claims Act, 31 USC 3729, by submitting claims to Medicare, Medicaid, and Dentquest (a federally subsidized program through Medicare/Medicaid.) The claims were fraudulent, because:

---

[2] The claims were requests or demands for money for dental services allegedly provided to persons covered by Medicare, Medicaid, and/or Dentquest.

12

  a. Tralongo billed Dentquest (a federally subsidized program through Medicare/Medicaid) for patients which West diagnosed and treated but Tralongo listed Dr. Katba (and his Social Security Number) as the treating dentist.

  b. West had been treating patients covered by Medicaid and Medicare even though he was prohibited him from doing so.  And Tralongo billed Medicare/Medicaid for those illegal, unlawful, or false-claims.

  c. West had been using the D9999 billing code to bill insurance companies in order to mask that he was billing for an entire procedure (such as preparing a crown and installing a crown) when he had only completed part of the procedure.  Insurance companies do not pay for the entire procedure up front. The provider must bill each segment of the procedure separately.)

40. The Defendants have knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim within the meaning of 31 USC 3729. The records were fraudulent and/or the statement was material to a false or fraudulent claim, because:

  a. Tralongo billed Dentquest (a federally subsidized program through Medicare/Medicaid) for West's own patients but listed Dr. Katba (and his Social Security Number) as the treating dentist.

    b. West had been treating patients covered by Medicaid and Medicare even though the federal government had prohibited him from doing so. And Tralongo billed Medicare/Medicaid for those fraudulent charges.

    c. West had been using the D9999 billing code to bill insurance companies in order to mask that he was billing for an entire procedure (such as preparing a crown and installing a crown) when he had only completed part of the procedure. (Insurance companies do not pay for the entire procedure up front. The provider must bill each segment of the procedure separately.)

    d. West had no license from the federal Drug Enforcement Agency to order prescription medicine. Other dentists had been prescribing for West's patients whom the other dentists had never diagnosed or treated.

41. The term "knowingly" used above means that the Defendants or their agents, with respect to information, had actual knowledge of the information.

42. Wyllie observed ongoing illegal, unlawful, or false-claims against the federal government by reviewing Tralongo's patient records and claims records.

43. In an effort to stop the illegal, unlawful, or false-claims against the federal government, Wyllie confronted Tralongo and its agents Trish George,

Mary Hughes, and Bethany Rose about the fraudulent activity. Wyllie's efforts to stop the illegal, unlawful or false-claims were activities protected under the Federal False Claims Act, 31 USC 3730(h).

44. Tralongo, and its agents Trish George, Mary Hughes, and Bethany Rose knew that Wyllie had engaged in protected activity, because he reported the illegal, unlawful or false-claims to George, Hughes, and Rose.

45. Tralongo and its agents Trish George, Mary Hughes, and Bethany Rose discharged Wyllie, because he engaged in protected activity by confronting Tralongo and its agents about the illegal, unlawful or false-claims against the federal government. The Defendants discriminated against Wyllie because of his efforts to stop 1 or more violations of 31 USCS § 3729.

46. As a result of the Defendants' wrongful discrimination, Wyllie has suffered feelings of mental anguish, distress, embarrassment, depression, and indignity.

47. The Defendants' wrongful discrimination is the proximate cause of Wyllie's damages, including, but not limited to: damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, moving expenses, and attorney's fees and costs.

48. The defendants' acted against the plaintiff intentionally and with an evil motive. Therefore, the plaintiff is entitled to punitive damages.

49. Under 31 USC 3730(h), the plaintiff is entitled to 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## COUNT II – DISCHARGE IN VIOLATION OF PUBLIC POLICY UNDER MICHIGAN LAW

50. Wyllie incorporates paragraphs 1 to 49 above by reference.

51. Assuming for purposes of Count II that Wyllie is not protected by the Retaliation Provision of the Federal False Claims Act, there is no applicable statutory prohibition against discharge in retaliation for the Wyllie's conduct at issue.

52. The Defendants discharged Wyllie because, in the course of his employment, he failed and refused to violate:

    a. the Federal False Claims Act, 31 USC 3729;

    b. the following provisions of the Michigan Insurance Code:

> (1) A person who commits a fraudulent insurance act under section 4503 is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $50,000.00, or both, and shall be ordered to pay restitution as provided in section 1a of chapter IX of the code of criminal procedure, Act No. 175 of the Public Acts of 1927, being section 769.1a of the Michigan Compiled Laws, and in

16

> the crime victim's rights act, Act No. 87 of the Public Acts of 1985, being sections 780.751 to 780.834 of the Michigan Compiled Laws.
>
> (2) A person who enters into an agreement or conspiracy to commit a fraudulent insurance act under section 4503 is guilty of a felony, punishable by imprisonment for not more than 10 years or by a fine of not more than $50,000.00, or both, and shall be ordered to pay restitution as provided in section 1a of chapter IX of the code of criminal procedure, Act No. 175 of the Public Acts of 1927, being section 769.1a of the Michigan Compiled Laws, and in the crime victim's rights act, Act No. 87 of the Public Acts of 1985, being sections 780.751 to 780.834 of the Michigan Compiled Laws.

MCL § 500.4511.

> A fraudulent insurance act includes, but is not limited to, acts or omissions committed by any person who knowingly, and with an intent to injure, defraud, or deceive:
>
> (a) Presents, causes to be presented, or prepares with knowledge or belief that it will be presented to or by an insurer or any agent of an insurer, or any agent of an insurer, reinsurer, or broker any oral or written statement knowing that the statement contains any false information concerning any fact material to an application for the issuance of an insurance policy.
>
> (b) Prepares or assists, abets, solicits, or conspires with another to prepare or make an oral or written statement that is intended to be presented to or by any insurer in connection with, or in support of, any application for the issuance of an insurance policy, knowing that the statement contains any false information concerning any fact or thing material to the application.
>
> (c) Presents or causes to be presented to or by any insurer, any oral or written statement including computer-generated information as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains false information concerning any fact or thing material to the claim.

17

> (d) Assists, abets, solicits, or conspires with another to prepare or make any oral or written statement including computer-generated documents that is intended to be presented to or by any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false information concerning any fact or thing material to the claim.

MCL § 500.4503.

53. By discharging Wyllie, the defendants intended to contravene the public policies of the state and federal government including, but not limited to, the policies expressed in the above acts.

54. As a result of the Defendants' wrongful discrimination, Wyllie has suffered feelings of mental anguish, distress, embarrassment, depression, and indignity.

55. The Defendants' wrongful discrimination is the proximate cause of Wyllie's damages, including, but not limited to: damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, moving expenses, and attorney's fees and costs.

56. Wyllie is entitled to damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, moving expenses, and attorney's fees and costs.

## **RELIEF REQUESTED**

For these reasons, the Plaintiff, Nelson Wyllie, asks:

A. That Defendants be required to appear and answer the allegations of the Complaint;

B. That this Court award to Plaintiff actual damages, including, but not limited to: damages for loss of past and future salary and fringe benefits, emotional distress, exemplary damages, expenses associated with seeking other employment, moving expenses plus interest and attorney's fees and costs;

C. That this Court award to Plaintiff 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including interest, litigation costs, and, reasonable attorneys' fees;

D. That this Court award to Plaintiff punitive damages.

E. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

By /s/ Robert L. Levi
Robert L. Levi
Robert L. Levi, P.C.
6675 Edwood Ave.
West Bloomfield, MI 48324
robert@robertlevilaw.com
248-366-4412
State of Michigan Bar No. 42598

Date: January 29, 2018

## **JURY DEMAND**

The Plaintiff demands a jury to try this cause.

        Respectfully submitted,

        By /s/ Robert L. Levi
        Robert L. Levi
        Robert L. Levi, P.C.
        6675 Edwood Ave.
        West Bloomfield, MI 48324
        robert@robertlevilaw.com
        248-366-4412
        State of Michigan Bar No. 42598

Date: January 29, 2018